# UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**RUBEN ANDERSON**                                                   **CIVIL ACTION**

**versus**                                                          **NO. 10-1691**

**LYNN COOPER**                                                     **SECTION: "A" (1)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  <u>See</u> 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Ruben Anderson, is a state prisoner incarcerated at the Avoyelles Correctional Center, Cottonport, Louisiana.  On June 28, 2004, he was convicted of manslaughter under Louisiana law.[1]  On July 12, 2004, he was sentenced to a term of thirty years imprisonment without benefit of probation, parole, or suspension of sentence.[2]  On March 30, 2005, the Louisiana

---

[1] State Rec., Vol. I of II, minute entry dated June 28, 2004.

[2] State Rec., Vol. I of II, minute entry dated July 12, 2004.

Fourth Circuit Court of Appeal affirmed his conviction, amended his sentence to delete the prohibition on parole, and affirmed the sentence as amended.[3] The Louisiana Supreme Court then denied his related writ application on March 10, 2006.[4]

On April 5, 2006, petitioner filed a federal application for *habeas corpus* relief. However, that application was subsequently dismissed at petitioner's request.[5]

On April 10, 2006, petitioner filed with the state district court an application for post-conviction relief.[6] When the court failed to rule on that application, he filed with the Louisiana Fourth Circuit Court of Appeal an application for a writ of mandamus.[7] On May 30, 2006, the Court of Appeal held: "The claims in relator's application for post-conviction relief have been reviewed. Relator has failed to show that he is entitled to relief. His request for a writ of mandamus is

---

[3] State v. Anderson, No. 2004-KA-1905 (La. App. 4th Cir. Mar. 30, 2005) (unpublished); State Rec., Vol. II of II.

[4] State *ex rel.* Anderson v. State, 925 So.2d 501 (La. 2006) (No. 2005-KH-1539); State Rec., Vol. II of II.

[5] Anderson v. Cooper, Civ. Action No. 06-2027, 2006 WL 2404003 (E.D. La. July 13, 2006), adopted, 2006 WL 2423026 (E.D. La. Aug. 17, 2006).

[6] State Rec., Vol. II of II. The state court record does not reflect when that application was filed; however, the parties agree that the Court should use April 10, 2006, as the filing date. See Rec. Doc. 10, pp. 2 and 4; Rec. Doc. 4-1, p. 7.

[7] State Rec., Vol. II of II.

denied."[8]  Petitioner's related writ application was then denied by the Louisiana Supreme Court on April 5, 2007.[9]

On September 12, 2007, petitioner filed with the state district court motion to reopen the post-conviction proceedings, a motion to recuse Judge Raymond Bigelow, and a motion for subpoenas.[10]  On August 26, 2008, Judge Julian Parker denied the motion to recuse Judge Bigelow.[11]  On September 16, 2008, petitioner filed with the state district court a "Notice of Intent to Seek Writs and/or Motion for Extension of Time to Seek Writs."[12]  When there was no response from the district court, he filed an application for a writ of mandamus with the Louisiana Fourth Circuit Court of Appeal.[13]  The Court of Appeal returned that application unfiled and instructed petitioner simply to file his writ application as soon as possible.[14]  Petitioner ignored that suggestion, opting instead to file an application for a writ of mandamus with the Louisiana Supreme Court.[15]  On April 3, 2009, the Louisiana Supreme Court ruled:

---

[8] State v. Anderson, No. 2006-K-0520 (La. App. 4th Cir. May 30, 2006) (unpublished); State Rec., Vol. II of II.

[9] State *ex rel.* Anderson v. State, 954 So.2d 137 (La. 2007) (No. 2006-KH-1809); State Rec., Vol. II of II.

[10] State Rec., Vol. I of II.

[11] State Rec., Vol. I of II, minute entry dated August 26, 2008.

[12] State Rec., Vol. II of II.

[13] State Rec., Vol. II of II.

[14] State Rec., Vol. II of II, letter to petitioner from the Clerk of Court dated January 26, 2009.

[15] State Rec., Vol. II of II.

Relator represents that the district court has failed to act timely on a notice for intent/motion for extension to seek writs filed on or about September 16, 2008 and to obtain a copy of a judgment issued August 26, 2008 on a motion to reopen post-conviction relief proceedings and motion to recuse the Hon. Judge Raymond Bigelow. If relator's representation is correct, the district court is ordered to consider and act on the application.  If relator's representation is incorrect, the district court is ordered to accept, file and act upon the pleading which is herewith transferred to the district court.  The district court is ordered to provide this court with a copy of its judgment.[16]

A minute entry reflects that the district court thereafter denied "DEFENDANT'S MOTION FOR SDT" on August 25, 2009.[17]  Petitioner then filed an application asking that the Louisiana Supreme Court enforce its prior order.[18]  On November 20, 2009, the Louisiana Supreme Court denied that application, stating:  "Moot.  The district court has acted."[19]

While those proceedings were ongoing, petitioner also filed with the state district court a "Motion for Court to Conduct In-Camera Inspection of the State's Files/Grand Jury Testimony" on March 17, 2009.[20]  That motion was denied on April 7, 2009.[21]

---

[16]  State ex rel. Anderson v. State, 6 So.3d 759 (La. 2009) (No. 2009-KH-0675); State Rec., Vol. II of II.

[17]  State Rec., Vol. II of II, minute entry dated August 25, 2009.

[18]  State Rec., Vol. II of II.

[19]  State ex rel. Anderson v. State, 25 So.3d 796 (La. 2009) (No. 2009-KH-0675); State Rec., Vol. II of II.

[20]  State Rec., Vol. I of II.

[21]  State Rec., Vol. I of II, Judgment dated April 7, 2009.

On May 18, 2010, petitioner filed the instant federal application for *habeas corpus* relief.[22]  He asserts the following claims in support of his application:

1.      Petitioner received ineffective assistance of counsel;

2.      The state failed to disclose evidence to the defense as required by Brady v. Maryland, 373 U.S. 83 (1963), and its progeny; and

3.      The state failed to produce a transcript of the post-conviction hearing.

### I.  Timeliness

The state contends that petitioner's federal application is untimely.[23]  The Court is unconvinced.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") generally requires that a petitioner bring his Section 2254 claims within one (1) year of the date on which his underlying criminal judgment becomes "final."  Under the AEDPA, a judgment is considered "final" upon the expiration of time for seeking direct review.  28 U.S.C. § 2244(d)(1)(A).[24]

As noted, the Louisiana Supreme Court denied petitioner's writ application on direct review on March 10, 2006.  Therefore, under § 2244(d)(1)(A), his conviction and sentence became

---

[22]  Rec. Doc. 4.

[23]  Rec. Doc. 10.

[24]  Although § 2244(d)(1) has alternative provisions providing for other events which can trigger the commencement of the statute of limitations, those alternative provisions are not applicable in the instant case.

–  5  –

"final" on June 8, 2006, when his period expired for seeking a writ of certiorari from the United States Supreme Court.  See Roberts v. Cockrell, 319 F.3d 690, 694 (5th Cir. 2003); Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999); Chester v. Cain, Civ. Action No. 01-1958, 2001 WL 1231660, at *3-4 (E.D. La. Oct. 15, 2001); see also U.S. Sup. Ct. R. 13(1).  Accordingly, his one-year period for seeking federal *habeas corpus* relief commenced on that date and expired one year later, unless that deadline was extended by tolling.

The Court first considers statutory tolling.  The AEDPA provides that the statute of limitations is tolled for the period of time during which a properly filed application for state post-conviction relief or other collateral review attacking a conviction or sentence is pending in state court.  28 U.S.C. § 2244(d)(2).  Consequently, this Court must consider petitioner's state court filings.

Before his conviction was even final and any days of the limitations period elapsed, petitioner tolled the period by filing a post-conviction application on April 10, 2006.  Tolling then continued uninterrupted for the duration of the post-conviction proceedings, so long as he sought supervisory review in a timely manner.  Grillette v. Warden, Winn Correctional Center, 372 F.3d 765, 769-70 (5th Cir. 2004).  The state does not contend, and the state court record does not reflect, that petitioner's related appellate court writ applications were untimely.  Therefore, tolling continued uninterrupted until the Louisiana Supreme Court denied relief on April 5, 2007.

After the limitations period commenced on that date, one hundred fifty-nine (159) days elapsed before petitioner filed with the state district court a motion to reopen the post-conviction proceedings on September 12, 2007.  The state ignores that motion in its response;

– 6 –

however, it is at least arguable that such a motion qualifies a petitioner for tolling under § 2244(d)(2).  See, e.g., Streu v. Dormire, 557 F.3d 960, 965 (8th Cir. 2009); Kearns v. Hoke, Civ. Action No. 1:09cv156, 2010 WL 3120045, at *4 (N.D. W.Va. Aug. 5, 2010); Patterson v. Brandon, No. 3:07-0029, 2008 WL 821986, at *2 (M.D. Tenn. March 24, 2008).  Therefore, out of an abundance of caution, the Court finds that the motion to reopen the post-conviction proceedings tolled the limitations period as of September 12, 2007, the date of filing.

Moreover, this Court can find no ruling in the state court record with respect to that motion.  Petitioner seems to contend in his federal application that the motion was denied by Judge Julian Parker on August 26, 2008.[25]  However, the record does not support that contention.  It appears that Judge Parker issued no written ruling, and the minute entry reflects only that Judge Parker denied *the motion to recuse Judge Bigelow* and then transferred the case back to him.[26]

It is true that after the Louisiana Supreme Court's ruling of April 3, 2009, which directed the district court to act, the district court issued another minute entry stating that it denied "DEFENDANT'S MOTION FOR SDT" on August 25, 2009.[27]  Although that ruling is unclear, it does not appear to be a ruling on the motion to reopen; rather, it is perhaps a ruling on petitioner's separate and distinct "Motion to Subpoena" filed contemporaneously with the motion to reopen on September 12, 2007.  Therefore, at least arguably, the motion to reopen the post-conviction proceedings has remained pending, and the federal limitations period therefore has remained tolled,

---

[25]  Rec. Doc. 4-1, p. 7.

[26]  State Rec., Vol. I of II, minute entry dated August 26, 2008.

[27]  State Rec., Vol. II of II, minute entry dated August 25, 2009.

since September 12, 2007.  If so, petitioner's federal application would be timely, in that only one hundred fifty-nine (159) days of his one-year limitations period would have elapsed prior to the federal application's filing.

In light of the foregoing uncertainty, the Court declines to recommend that petitioner's federal application be dismissed as untimely.  Rather, the Court believes that the better course is simply to deny petitioner's claims on the merits, in that they clearly do not warrant relief for the following reasons.

## II.  Standards of Review

The AEDPA comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of law, questions of fact, and mixed questions of law and fact.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and pure questions of fact are reviewed under § 2254(d)(2).  Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28

U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses

[of § 2254(d)(1)] have independent meaning."  <u>Bell</u>, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals

has explained:

> A state court decision is contrary to clearly established precedent if
> the state court applies a rule that contradicts the governing law set
> forth in the [United States] Supreme Court's cases.  A state-court
> decision will also be contrary to clearly established precedent if the
> state court confronts a set of facts that are materially
> indistinguishable from a decision of the [United States] Supreme
> Court and nevertheless arrives at a result different from [United
> States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir.) (internal quotation marks, ellipses, brackets, and

footnotes omitted), <u>cert. denied</u>, 131 S.Ct. 294 (2010).

Regarding the "unreasonable application" clause, the United States Supreme Court

has explained:

> [A] state-court decision can involve an "unreasonable application" of
> this Court's clearly established precedent in two ways.  First, a
> state-court decision involves an unreasonable application of this
> Court's precedent if the state court identifies the correct governing
> legal rule from this Courts cases but unreasonably applies it to the
> facts of the particular state prisoner's case.  Second, a state-court
> decision also involves an unreasonable application of this Court's
> precedent if the state court either unreasonably extends a legal
> principle from our precedent to a new context where it should not
> apply or unreasonably refuses to extend that principle to a new
> context where it should apply.

<u>Williams v. Taylor</u>, 529 U.S. 362, 407 (2000).  The Supreme Court has noted that the focus of this

inquiry "is on whether the state court's application of clearly established federal law is objectively

unreasonable, and we stressed in <u>Williams</u> that an unreasonable application is different from an incorrect one."   <u>Bell</u>, 535 U.S. at 694.

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2); <u>see also</u> 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

### III.  Facts

On direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the facts of this case as follows:

> Francis "Jay" Demarest was killed by a single shotgun blast to his chest on September 6, 2003. Officer Michael Sam, responding to a 911 call placed by Mary Begg, found the victim's body on the ground at the rear of the driveway of the victim's residence on Franklin Avenue.  Officer Sam called for homicide officers to come to the scene.  Sergeant Larry Green became the lead investigating homicide detective.  He interviewed Ms. Begg and checked the victim's residence.  From this, he identified Rachel Lally and the defendant Ruben Anderson as "persons of interest" in the murder. Sergeant Green disseminated the names and photographs of Lally and Anderson to the media.  The next day, Rachel Lally appeared at the Third District station because she had seen a report on the television that the police wanted to talk with her.  Sergeant Green interviewed Lally, and from that interview, he determined that the defendant had committed the murder.  He obtained an arrest warrant for the defendant, who turned himself in a day or two later.  At the time he

turned himself in, the defendant also turned his truck over to the police; however, the subsequent search of the truck failed to disclose any evidence.

At trial, the defense cross-examined Sergeant Green regarding his interviews with Mary Begg and Rachel Lally. The sergeant stated that neither woman said she saw the defendant shoot the victim. Mary Begg did not testify at trial.

Rachel Lally did testify at trial. She admitted that she had two felony convictions and was presently incarcerated. She also stated that, when she went to the police regarding the homicide, she knew that she was wanted for a probation violation from Jefferson Parish, and in fact was taken into custody based on that outstanding warrant. Lally testified that the defendant was her former boyfriend; she broke up with him early on the night of the murder. Both she and the defendant had been living at the victim's residence for approximately two weeks before the murder. On the night the victim was shot, she offered to help the victim clean out a closet. As they were doing this, the defendant began to harass her. The victim told the defendant to stop, but the defendant continued to verbally harass them. Ultimately, the defendant and the victim engaged in a fistfight. As a result of the fight, the defendant was bleeding from his face, but the victim, who was larger than the defendant, was unharmed. When the fight was over, the victim told the defendant to give him back his house keys and to move out. The defendant gave up the keys and left. A short time later, the defendant returned and knocked on the door. He asked to come in and retrieve his belongings. The victim allowed him back inside. However, words were again exchanged, and finally the victim grabbed the defendant and physically threw him outside. The victim followed the defendant out. According to Lally's trial testimony, she immediately locked the front iron gate and wooden door so that the defendant could not come back in. A few minutes later she heard the victim say, "So, what you going to do now, shoot me, m_____, f_____?" A moment later she heard an explosion; she could also smell gunpowder. She told Mary Begg to call 911, and after struggling with the keys for a few moments, she opened the front door and went outside to check on the victim. Lally testified that she saw the victim with a wound to his chest, but she did not see the defendant or his truck. Lally further testified that she then walked away from the residence, and after finding someone who would let her use a phone, she called a cab. She turned herself in the next day after seeing the news broadcast indicating that the police wanted to talk to her.

In further testimony, Rachel Lally testified that she had seen a shotgun behind the seat in the defendant's truck at some point during their relationship. She also identified a letter written to her by the defendant in October 2003. In that letter, which she read to the jury, the defendant denied killing Jay Demarest. He stated that a man looking for money owed to him by Lally robbed him outside the victim's residence. The defendant claimed that he and the robber fought over the robber's gun, and when the victim came out, the robber shot the victim.

On cross-examination, Rachel Lally admitted that she had been using cocaine and drinking vodka continuously for the two days prior to the time of the murder; she indicated that the victim and the defendant had also been doing drugs and drinking. She also admitted that she had been a cocaine abuser since 1982. Defense counsel elicited an acknowledgement from Lally that, in her statement to the police, she stated that the fight occurred around 12:30 a.m., but that the 911 call was made at 2:49 a.m. The defense also elicited that Lally is deaf in one ear, that she did not see or hear the defendant's truck leaving the scene, and that the defendant had told her that his shotgun was a .20 gauge weapon. Lally further testified that she broke up with the defendant because he invited Mary Begg over to the residence that night. Finally, she admitted that the defendant and victim were "apologetic" after the fistfight and that she did not hear the defendant threaten the victim.

Dr. Richard Tracy testified that he performed the autopsy on the victim. He recovered shotgun pellets and wadding from the body. He also noted that the victim had fresh scratches and scrapes on the knuckles of his right hand. Dr. Tracy identified the toxicology report which indicated that the victim's blood alcohol level was .19 and that his urine was positive for cocaine and valium.

Photographs of the defendant taken at the time of his arrest showed bruising around his face and ear and an abrasion near his eye.

Officer Kenneth Leary, an expert in the examination of firearms, testified that he examined the pellets and shotgun wadding recovered from the victim's body. He stated that the pellets were consistent with .12 gauge ammunition. He further testified that the wadding was .12 gauge. He stated that the wadding could not have been fired from a .20 gauge shotgun because the wadding was too large to fit a .20 gauge weapon. He further testified that, because wadding was found in the victim's body, the shot must have come from a fairly close distance.

The defendant did not testify.  The defense called two witnesses.  The first was Sergeant Doug Eckert who participated in the investigation and the arrest of the defendant.  He testified that the defendant made a spontaneous statement that somebody accosted him for money.

The second defense witness was the defendant's father, Earl Anderson.  He testified that he gave the defendant a .20 gauge shotgun when he was eleven.  He admitted, however, that the defendant was in his forties and had not lived with him for approximately twenty years.[28]

## IV.  Plaintiff's Claims

### A.  Ineffective Assistance of Counsel

Petitioner claims that he received ineffective assistance of counsel.[29]  The United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel.  A petitioner seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 697 (1984).  A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective."  Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000).  If a court finds

---

[28] State v. Anderson, No. 2004-KA-1905, at pp. 1-5  (La. App. 4th Cir. Mar. 30, 2005) (unpublished); State Rec., Vol. II of II.

[29] It does not appear that petitioner's ineffective assistance claims are properly exhausted as required by 28 U.S.C. § 2254(b)(1)(A).  However, a federal court has the authority to deny *habeas* claims on the merits, regardless of whether the petitioner exhausted his state court remedies and whether exhaustion is waived by the state.  28 U.S.C. § 2254(b)(2); Jones v. Jones, 163 F.3d 285, 299 (5th Cir. 1998); Woods v. Cain, Civil Action No. 06-2032, 2008 WL 2067002, at *8 n.8 (E.D. La. May 13, 2008).  Because petitioner's claims clearly have no merit, and because of the confusion which occurred in the state post-conviction proceedings, the undersigned recommends that the claims simply be considered and rejected on the merits in the interest of judicial economy.

that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong.  Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment.  See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001).  "Counsel's performance is deficient if it falls below an objective standard of reasonableness."  Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998).  Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances.  See Strickland, 466 U.S. at 689.  "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'"  Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690).  A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation.  See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

The appropriate standard for determining prejudice varies slightly depending on whether a petitioner is challenging the actions of trial or appellate counsel.  In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  In this context, a reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  In making a determination as to whether prejudice

–  14  –

occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial."   <u>Crockett</u>, 796 F.2d at 793.  In order to prove prejudice with respect to a claim that appellate counsel was ineffective, a petitioner must show a reasonable probability that he would have prevailed on appeal but for his counsel's deficient representation. <u>Briseno v. Cockrell</u>, 274 F.3d 204, 207 (5th Cir. 2001); <u>see also</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 286 (2000).  Therefore, a petitioner must demonstrate a reasonable probability that, if appellate counsel's performance had not been deficient in the manner claimed, the appellate court would have vacated or reversed the trial court judgment based on the alleged error.  <u>Briseno</u>, 274 F.3d at 210.

With respect to this claim, petitioner first alleges that counsel was ineffective for failing to properly investigate the case by filing timely pretrial motions for discovery.  That allegation is patently false.  Defense counsel filed a consolidated motion covering various pretrial matters, including numerous discovery requests.[30]  Moreover, in any event, the state turned over its entire file to the defense except for attorney notes,[31] specifically including the police report on which petitioner appears to base his claim,[32] and therefore defense would not have been ineffective even if he had failed to conduct discovery.  <u>See</u> <u>Strickler v. Green</u>, 527 U.S. 263, 283 n.23 (1999) ("[I]f a prosecutor asserts that he complies with <u>Brady</u> through an open file policy, defense counsel may

---

[30]  State Rec., Vol. I of II, Defendant's Consolidated Pretrial Motions.

[31]  State Rec., Vol. I of II, State's Response to Defendant's Motion to Produce Exculpatory Evidence ("[D]efense counsel had been provided with copies of all the documents contained within the District Attorney's file except attorney's notes.").

[32]  State Rec., Vol. I of II, State's Response to Defendant's Motion to Produce Initial Police Report ("Defense counsel has been provided with a copy of *all* the police reports in this matter." (emphasis added)).

reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under Brady."); Smith v. Maggio, 696 F.2d 365, 367 (5th Cir. 1983) ("Counsel had no duty to file pretrial motions, because the prosecutor established an open file policy that made the filing of discovery motions or Brady requests pointless."); Stoves v. LeBlanc, Civ. Action No. 04-2037, 2010 WL 3523012, at *7 (E.D. La. Apr. 19, 2010), adopted, 2010 WL 3522957 (E.D. La. Sept. 1, 2010); Garza v. Director, Civ. Action No. 9:08cv115, 2009 WL 33428, at *7 (E.D. Tex. Jan. 6, 2009); Rose v. Johnson, 141 F.Supp.2d 661, 684 (S.D. Tex. 2001); United States v. Patterson, 882 F.Supp. 104, 106 (S.D. Tex. 1995).

Further, to the extent that petitioner may be arguing that counsel failed to conduct an adequate pretrial investigation in other respects, he has not proven his claim.  A petitioner asserting a claim for inadequate investigation bears the burden to provide factual support as to what further investigation would have revealed.  See Moawad v. Johnson, 143 F.3d 942, 948 (5th Cir. 1998); see also Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Davis v. Cain, Civ. Action No. 07-6389, 2008 WL 5191912, at *10 (E.D. La. Dec. 11, 2008).  In the instant case, petitioner has brought forth *no* evidence to show that further investigation would have revealed any information whatsoever which would have been beneficial to the defense.  Without such evidence, he cannot make the required showing that he was prejudiced by the allegedly inadequate investigation.

Petitioner next claims that counsel failed to file a motion for production of transcripts of a pretrial hearing concerning a request for an expert witness.  With respect to this claim, it appears that petitioner is faulting trial counsel.  If so, the claim is clearly meritless.  The ordering of

transcripts would have been the responsibility of appellate counsel.[33]   Second, to the extent that

petitioner is in fact attempting to assert a claim against his appellate counsel, that claim fares no

better for the following reasons.

The history regarding the request for an expert is set forth in affidavits by Pablo

Gonzalez and Philip de V. Claverie, Jr., student practitioners who assisted with petitioner's defense.

In their identical affidavits, the students stated:

> 4.    In Mr. Anderson's trial, we filed a motion seeking the court's approval for an expert witness.
>
> 5.    The expert witness was to testify as to the effects that years of crack-cocaine abuse may have on one's memory, especially as it related to the State's witness, Rachel Lally.
>
> 6.    Based on our limited means, we contacted an M.D., who was a resident at Tulane Medical School and asked if he would testify without charge.
>
> 7.    However, the trial judge concluded, in chambers, that the witness did not qualify as an expert because his writings focused on gastro-intestinal issues, not psychiatric issues.
>
> 8.    In addition, after consulting Dane Ciolino, we, as a tactical decision, decided not to call the expert witness.
>
> 9.    On cross examination of Rachel Lally, we, as Ruben Anderson's counsel, felt that we had effectively proven to the jury that Lally's years of cocaine use affected her memory and mental stability.[34]

---

[33]   Trial counsel, Dane S. Ciolino and the Loyola Law Clinic, did not handle the appeal; rather, petitioner was represented on appeal by Laura Pavy of the Louisiana Appellate Project.  State Rec., Vol. I of II, Order date July 12, 2004; State Rec. Vol. II of II, Original Brief of Appellant.

[34]   State Rec., Vol. I of II, affidavits of Pablo Gonzalez and Philip de V. Claverie, Jr., dated November 28, 2005.

In his later response to a disciplinary complaint, Ciolino stated that it appeared that

no written motion had in fact been filed, but he agreed that petitioner was not prejudiced by Judge

Bigelow's denial of the request for the expert:

> Mr. Anderson's file does not contain a copy of a motion requesting funding for an expert witness. Why this is so is uncertain. At some point prior to Mr. Anderson's first trial [which ended in a hung jury], I distinctly remember discussing the issue of expert funding in Judge Bigelow's chambers. I explained to Judge Bigelow that a medical doctor (who was a friend of Mr. Gonzales) was willing to testify that the types of drugs used by the State's principal eyewitness at the time of the homicide could have affected her ability to perceive and recall the events in question. I remember Judge Bigelow stating that he believed that such testimony was unnecessary because the point was "obvious." I also remember that Judge Bigelow was skeptical about our proposed expert's qualifications (Mr. Gonzales' friend was, I believe, a gastroenterologist).
>
> I discussed this issue (again) with Mr. Gonzales yesterday, and we both now assume that we did not file a formal motion after Judge Bigelow told us in chambers that he would not fund our proposed expert. At the time, I, like Judge Bigelow, believed that the proposed expert's testimony was on a point that was obvious. I also believed then – and still believe today – that the testimony from the proposed expert was not necessary to provide Mr. Anderson with a proper defense.[35]

In light of the foregoing, it is unclear if such a motion was in fact formally filed and

if the discussion with the judge in chambers was even recorded so that it could be transcribed. If

not, appellate counsel obviously was not ineffective for failing to procure a transcript.

Moreover, even if such a motion was filed and a transcript could have been obtained,

appellate counsel was not ineffective for failing to pursue the proposed claim challenging the denial

---

[35] State Rec., Vol. I of II, letter to Charles Plattsmier from Dane S. Ciolino dated November 23, 2006, p. 1.

of the expert witness.  As an initial matter, it must be remembered that "[c]ounsel is not obligated to urge on appeal every nonfrivolous issue that might be raised (not even those requested by defendant)."  West v. Johnson, 92 F.3d 1385, 1396 (5th Cir. 1996).  As the United States Supreme Court has noted, "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."  Jones v. Barnes, 463 U.S. 745, 751-52 (1983).  Far from evidencing ineffectiveness, an appellant counsel's restraint often benefits his client because "a brief that raises every colorable issue runs the risk of burying good arguments . . . in a verbal mound made up of strong and weak contentions."  Id. at 753.  Further, in the instant case, it is evident that the appellate counsel did not err in omitting the suggested claim because there is simply no reason to believe that the expert was wrongly denied or that any harm resulted which would have warranted reversal on appeal.[36]

---

[36]   The Court notes that a defendant must meet a high burden before a judge is required to provide funding for an expert witness, and a trial judge's denial of such a request is overturned on appeal only for an abuse of discretion.  The Louisiana Supreme Court has held:

> From the outset, we note that at a hearing on expert funding, whether ex parte or contradictory, defendant has the burden to show a need for the funding by establishing with a reasonable degree of specificity what type of expert is needed and the purpose for which the expert is required.  He must show it is more likely than not the expert assistance will be required to answer a serious issue or question raised by the State's or defense's theory of the case, and that denial would result in an unfair trial.  If this burden is met, the trial court is to order the state to provide those funds.  A reviewing court examines a denial of funding under the abuse of discretion standard.

State v. Lee, 976 So.2d 109, 137 (La. 2008) (citations omitted).  Clearly, petitioner could not show such an abuse of discretion in this case, especially in light of the fact that the expert would have testified only that severe drug abuse can adversely affect perception, a matter that would be fairly evident to lay jurors even without expert testimony.

Petitioner also claims that counsel failed to ensure that the correct assignments of error were asserted on appeal.  Again, it appears that petitioner is faulting trial counsel; however, this, too, would have been the responsibility of appellate counsel.  However, to the extent that petitioner means to assert the claim against appellate counsel, the claim has no merit.  As noted previously, appellate counsel's performance is not rendered deficient merely because she fails to raise every argument desired by her client.  Moreover, petitioner suffered no prejudiced by counsel's failure to raise his desired claims because he was allowed to assert the additional claims in a *pro se* supplemental brief.[37]  The Louisiana Fourth Circuit Court of Appeal then considered those claims and found that they had no merit.[38]  Accordingly, petitioner cannot demonstrate a reasonable probability that he would have prevailed on appeal if those same claims had been asserted by his counsel.

Lastly, the Court notes that, although not argued within the body of his ineffective assistance claim, petitioner also contends that counsel was ineffective for failing "to expose the fact that the District Attorney's office used an expert in Forensic Pathology, as an expert in Toxicologist [sic]."[39]  However, as the Louisiana Fourth Circuit Court of Appeal explained on direct appeal:

> The appellant further appears to argue that the testimony of Dr. Tracy on this issue [of the effect of drug use] was improper because Dr. Tracy was not established to be an expert.  However, the record establishes that it was defense counsel who first asked Dr. Tracy about the effect of drugs and alcohol on a person's system with

---

[37]  State Rec., Vol. II of II, Supplemental Brief.

[38]  Anderson, No. 2004-KA-1905, at pp. 14-19; State Rec., Vol. II of II.

[39]  See Rec. Doc. 4-1, p. 12.

–  20  –

> regard to his or her ability to perceive and recall events.  The State did not ask any questions in this area until redirect, specifically noting that its questions were a "follow-up" to defense counsel's questions.   Therefore, although Dr. Tracy may not have been qualified as an expert in the particular area of the effect of drugs and alcohol, the defense waived any basis to object by opening the door to the testimony.[40]

Therefore, petitioner has failed to show that there was a basis for defense counsel to object to the questioning of Dr. Tracy on redirect.  Moreover, petitioner has not even explained how he was supposedly harmed by Dr. Tracy's testimony on this point, much less shown the required prejudice necessary to support an ineffective assistance claim.

For all of the foregoing reasons, the Court finds that all of petitioner's ineffective assistance of counsel claims have no merit.

### B.  Brady Violation

Petitioner's next claim is that the state failed to disclose evidence to the defense as required by <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and its progeny.  Specifically, petitioner contends that the prosecution failed to turn over police reports indicating that Mary Begg was a material witness who gave a statement to Officer Green.  Although a copy of the trial transcript has not been furnished to this Court, the Louisiana Fourth Circuit Court of Appeal noted that "[a]t trial, the defense cross-examined Sergeant Green regarding his interviews with Mary Begg and Rachel Lally.  The sergeant stated that neither woman said she saw the defendant shoot the victim."[41]

---

[40]  <u>Anderson</u>, No. 2004-KA-1905, at p. 17; State Rec., Vol. II of II.

[41]  <u>Anderson</u>, No. 2004-KA-1905, at p. 2; State Rec., Vol. II of II.

On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected petitioner's

Brady claim, holding:

> The appellant further argues in this assignment of error that the State failed to disclose a key witness whose testimony would have had a substantial impact on the outcome of the trial. However, the appellant never indicates who this "key witness" is. No name is given, nor does he indicate what this missing witness's testimony would have been. If the appellant is referring to Mary Begg, her existence was not withheld from the appellant, and in fact would have been known to him because she was in the house when his altercation with the victim occurred. Moreover, the defense filed a motion in limine to exclude the tape of the 911 call. In the supporting memorandum the defense asked that, if the call was admitted into evidence, the court exclude the portion wherein the caller, Mary Begg, identified the defendant as the person who did the shooting because she "is not going to be present at trial, nor does the jury have the opportunity to observe her demeanor." The reason or reasons why Mary Begg was not going to appear at trial are not discernible. However, contrary to the appellant's pro se argument, there is absolutely nothing to indicate that her testimony would exculpate him, assuming that she is the witness whom the State failed to disclose. Accordingly, this argument has no merit.[42]

The AEDPA places severe limitations on this Court's review of the state court's

decision rejecting petitioner's Brady claim. The United States Fifth Circuit Court of Appeals has

cautioned:

> Under AEDPA, [a federal court] do[es] not decide de novo whether a state prisoner has sufficiently proven a Brady violation. See Yarborough v. Alvarado, 541 U.S. 652, 665, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter."); Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc) ("We have no authority to grant habeas corpus relief simply because we conclude, in our independent

---

[42] Anderson, No. 2004-KA-1905, at pp. 17-18; State Rec., Vol. II of II.

> judgment, that a state supreme court's application of [federal law] is erroneous or incorrect."). Rather, [a federal court] decide[s] whether the state court's <u>Brady</u> determination resulted in a decision that is contrary to, or involved an unreasonable application of, clearly established federal law. <u>Busby v. Dretke</u>, 359 F.3d 708, 717 (5th Cir. 2004).

<u>Dickson v. Quarterman</u>, 462 F.3d 470, 477-78 (5th Cir. 2006). For the following reasons, it is evident that high bar has not been surmounted in the instant case.

The law regarding <u>Brady</u> claims is clear:

> A <u>Brady</u> violation occurs when the government fails to disclose evidence materially favorable to the accused. This Court has held that the <u>Brady</u> duty extends to impeachment evidence as well as exculpatory evidence, and <u>Brady</u> suppression occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor.

<u>Youngblood v. West Virginia</u>, 547 U.S. 867, 869-70 (2006) (per curiam) (internal citations and quotation marks omitted).

Therefore, to prevail on this claim, petitioner must first show that the state in fact suppressed the disputed evidence. However, in this case, the state contends that the police report was provided to the defense,[43] and petitioner has offered no evidence, such as an affidavit from defense counsel, in support of his bald allegation that the report was withheld. Therefore, his claim fails at the initial prong of the <u>Brady</u> inquiry. <u>Williams v. Cain</u>, Nos. 06-0224 and 06-0344, 2009 WL 1269282, at *5 (E.D. La. May 7, 2009), <u>aff'd</u>, 359 Fed. App'x 462 (5th Cir. 2009), <u>cert. denied</u>,

---

[43] State Rec., Vol. I of II, State's Response to Defendant's Motion to Produce Initial Police Report ("Defense counsel has been provided with a copy of *all* the police reports in this matter." (emphasis added)). <u>See also</u> State Rec., Vol. I of II, State's Response to Defendant's Motion to Produce Exculpatory Evidence ("[D]efense counsel had been provided with copies of all the documents contained within the District Attorney's file except attorney's notes.").

130 S.Ct. 2107 (2010); see also Watson v. Cain, Civ. Action No. 06-613, 2007 WL 1455978, at *7 (E.D. La. May 17, 2007); Abron v. Cain, Civ. Action No. 05-876, 2006 WL 2849773, at * 10 (E.D. La. Oct. 3, 2006); Harris v. United States, 9 F.Supp.2d 246, 275 (S.D.N.Y. 1998) ("[T]he government does not bear the burden of establishing that documents were *not* withheld; it is [petitioner's] burden to prove that the government failed to disclose evidence favorable to [him].), aff'd, 216 F.3d 1072 (2nd Cir. 2000); see also United States v. Avellino, 136 F.3d 249, 261 (2nd Cir. 1998); Cruz v. Artuz, 97-CV-2508, 2002 WL 1359386, at *14 (E.D.N.Y. June 24, 2002).

In any event, irrespective of whether petitioner's claim can survive the first prong of the Brady inquiry, it is evident that it cannot survive the second prong's requirement that he establish that the allegedly suppressed evidence was "*materially* favorable to the accused." Youngblood, 547 U.S. at 869 (emphasis added). With respect to that issue, it must be remembered that it is not enough that the evidence might have been *helpful* to the defense. See, e.g., Kyles v. Whitley, 514 U.S. 419, 436-37 (1995) ("[T]he Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense."). Rather, the withheld evidence must have been "material" in the constitutional sense. On that point, the United States Supreme Court has held:

> Such evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different, although a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. The reversal of a conviction is required upon a showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Youngblood, 547 U.S. at 870 (internal citations and quotation marks omitted).

Here, the police report was not material in the constitutional sense because there is no evidence that it qualified as impeachment or exculpatory evidence. The report could not be used for impeachment purposes, because Begg did not testify at trial. There is also no indication that the police report was exculpatory as petitioner suggests. Begg apparently did not say that petitioner did not in fact kill the victim; instead, she purportedly said only that she did not *see* petitioner kill the victim.

Furthermore, to the extent that petitioner is contending that the defense would have called Begg to testify if only it had known of her existence through the police report, that contention is meritless. First, as noted by the state court, the defense was aware that Begg was a witness all along and could have subpoenaed her if desired. Second, it is clear that the defense had no intention of calling Begg. This was explained to petitioner in a letter from Andrew Duffy, a student practitioner who assisted with the defense. In that letter, which petitioner attached to his motion to reopen the post-conviction proceedings, Duffy explained:

> Mary Begg was subpoenaed for trial – by the state. I talked to Mary directly before the trial and from what she told me, she would have been a terrible witness for you because she would have backed Rachel's story 100%. There was some discussion about putting a material witness bond on her by the state but that apparently never came to pass. Strategically, Mary not showing up worked out well for you because we were able to argue that she had something to hide by not showing up. Recall that during the state's closing argument she said something about people ignoring subpoenas at Tulane and Broad every day. I don't think this is an issue that works for you. As

to trying to continue the trial to have Mary subpoenaed, this is moot since she *was* subpoenaed by the state.[44]

Similarly, in their letter to the Louisiana Attorney Disciplinary Board, which was also attached to petitioner's motion, student practitioners Pablo Gonzalez and Philip de V. Claverie, Jr., likewise explained:

> Anderson's contention that Mary Beggs [sic] ("Beggs") should have been called as a witness to give favorable testimony is both baffling and simply wrong. Beggs' testimony would have been devastating for Anderson.
>
> We interviewed the jurors after [petitioner's first trial which ended in a hung jury] and they stated that the biggest problem, other than Ruben Anderson taking the stand, was the state's failure to call Beggs to testify. This was the deciding factor for many jurors as to why the state did not carry its burden of proof. The jurors felt that "if the state did not call Beggs, she must have had something damaging to say," so they weighed Beggs' absence in favor of Anderson. However, the undersigned was aware that Beggs' testimony was not damaging to the state's case, in fact it strengthened it, TREMENDOUSLY!!! It not only corroborated Lally's testimony (identifying Anderson as the killer), it would have allowed Beggs' 911 call to be admitted as evidence, and Beggs' identified Anderson as the perpetrator of this crime in that call immediately after it happened.
>
> We obtained a favorable ruling at a pre-trial hearing excluding as hearsay the portion of the 911 tape wherein Beggs identified Anderson as the murderer because playing the tape for the jury without Beggs' live testimony would violate Anderson's constitutional right to confront his accuser. The ruling was a huge victory for Anderson because it left Lally as the only person to place Anderson at the shooting.

---

[44]   State Rec., Vol. I of II, letter to petitioner from Andrew Duffy dated July 18, 2006, p. 1.  Duffy reiterated this information in a subsequent letter to the Louisiana Attorney Disciplinary Board. State Rec., Vol. I of II, letter to Charles Plattsmier from Andrew Duffy dated August 30, 2006, p. 2.

In sum, Beggs as a witness would have sealed the State's case.[45]

For all of the foregoing reasons, petitioner simply has not demonstrated that the state court decision rejecting his <u>Brady</u> claim was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. Accordingly, applying the AEDPA's deferential standard, this Court likewise rejects that claim.

### C.  Failure to Produce Post-Conviction Hearing Transcript

Lastly, petitioner claims that the state violated his rights by failing to produce a transcript of the post-conviction hearing held by Judge Parker on August 26, 2008.  However, because this claim concerns only the state post-conviction proceedings and does not affect the validity of petitioner's underlying conviction or sentence, it is not cognizable in this federal *habeas corpus* relief and cannot serve as a basis for relief.  <u>See, e.g.</u>, <u>Duff-Smith v. Collins</u>, 973 F.2d 1175, 1182 (5th Cir. 1992) ("[I]nfirmities in state habeas proceedings do not constitute grounds for federal habeas relief.  We look only to the trial and direct appeal." (footnote omitted)); <u>see also</u> <u>Morris v. Cain</u>, 186 F.3d 581, 585 n.6 (5th Cir. 1999) ("[O]ur circuit precedent makes abundantly clear that errors in state postconviction proceedings will not, in and of themselves, entitle a petitioner to federal habeas relief."); <u>Nichols  v. Scott</u>, 69  F.3d 1255, 1275 (5th Cir. 1995) ("[E]rrors in a state habeas proceeding cannot serve as a basis for setting aside a valid original conviction. An attack on a state habeas proceeding does not entitle a petitioner to habeas relief in respect to his conviction, as it is an attack on a proceeding collateral to the detention  and not the detention  itself." (internal

---

[45]  State Rec., Vol. I of II, letter to Charles B. Plattsmier from Pablo Gonzalez and Philip de V. Claverie, Jr., dated September 1, 2006, p. 3.

quotation marks omitted)); <u>Anthony v. Cain</u>, Civ. Action No. 07-3223, 2009 WL 3564827, at *23 (E.D. La. Oct. 29, 2009); <u>Baham v. Allen Correctional Center</u>, Civ. Action No. 07-4075, 2009 WL 3148757, at *3 (E.D. La. Sept. 30, 2009); <u>Davis v. Cain</u>, Civ. Action No. 07-6389, 2008 WL 5191912, at *6 (E.D. La. Dec. 11, 2008); <u>Campbell v. Cain</u>, Civ. Action No. 06-3983, 2007 WL 2363149, at *2 n.23 (E.D. La. Aug.15, 2007).

### RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Ruben Anderson be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[46]

New Orleans, Louisiana, this nineteenth day of January, 2011.

**SALLY SHUSHAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[46] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.